## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Bridgette Trice, as trustee for the heirs
and next of kin of Devyn Bolton, deceased,

<table>
<tr><td>Plaintiffs,</td><td><strong>MEMORANDUM OPINION<br>AND ORDER</strong></td></tr>
<tr><td>v.</td><td>Civil No. 10-2804 ADM/DTS</td></tr>
</table>

Toyota Motor Corporation, et al.,

           Defendants.

_____

Quincy Ray Adams,

           Plaintiff,

      v.                                  Civil No. 10-2805 ADM/DTS

Toyota Motor Corporation, et al.,

           Defendants.

_____

W.B. Markovits, Esq., Christopher D. Stock, Esq., and Louise M. Roselle, Esq., Markovits, Stock & DeMarco, LLC, Cincinnati, OH, on behalf of Plaintiffs Bridgette Trice and Quincy Ray Adams.

Karlowba R. Adams Powell, Esq., Powell Law Office, St. Paul, MN, on behalf of Padden Law Firm, PLLC.

Nicholas R. Farnolo, Esq., and Hunter J. Shkolnik, Esq., Napoli Shkolnik, PLLC, Melville, NY, on behalf of Napoli Shkolnik.

_____

## I.  INTRODUCTION

Before the Court is Plaintiffs Bridgette Trice ("Trice") and Quincy Ray Adams'

("Adams") (collectively, "Plaintiffs") Motion for Authorization to Distribute Disputed

Attorneys' Fees and Medical Expense Proceeds [Trice Docket No. 716; Adams Docket No.

464].[1]  The Motion asks the Court to divide among the law firms that represented Plaintiffs the

40% contingency fee earned in these companion cases.[2]  Responses have been filed by Padden

Law Firm LLC ("Padden Firm"), Napoli Shkolnik PLLC ("Napoli Firm"),[3] and Robert Bolton.[4]

See Trice Docket Nos. 736, 746, 849.  Also before the Court are the Napoli Firm's Motion to

Seal [Trice Docket No. 843; Adams Docket No. 566] and Trice's Motion to Strike [Trice Docket

No. 850; Adams Docket No. 570].  For the reasons set forth below, Plaintiffs' Motion is granted,

Trice's Motion to Strike is denied, and the Napoli Firm's Motion to Seal is granted.

## II.  BACKGROUND

### A.  Procedural Posture

In February 2015, a jury found that a product defect in a 1996 Toyota Camry was the

direct cause of a tragic 2006 car accident that permanently injured Adams and rendered Trice's

daughter, six-year-old Devyn Bolton, a quadriplegic until she died from her injuries in 2007.

See Verdict [Trice Docket No. 550; Adams Docket No. 349].  On appeal, the Eighth Circuit

affirmed the jury's finding of liability but remanded the judgment amounts to this Court.  See

Op. USCA [Trice Docket No. 693; Adams Docket No. 446].  Thereafter, the parties stipulated to

---

[1] Citations to the "Trice Docket" are to civil case number 10-2804 ADM/DTS.  Citations to the "Adams Docket" are to civil case number 10-2805 ADM/DTS.

[2] The Motion also asked the Court to resolve claims by three medical providers that were seeking to recover a portion of the judgment proceeds.  These claims have been settled and are no longer at issue.  See Note 5, infra.

[3] The Napoli Firm was formerly known as Napoli Bern Ripka Shkolnik LLP.  Farnolo Decl. [Trice Docket No. 745; Adams Docket No. 479] ¶ 2.

[4] Robert Bolton, Devyn Bolton's biological father, is among the next of kin on whose behalf Trice filed this action.

2

judgment amounts of $5,543,453.22 for Trice and $1,717,384.82 for Adams.  See Stipulation J. Amounts [Trice Docket No. 714; Adams Docket No. 462].  A judgment reflecting these amounts was entered on December 8, 2017.  See J. [Trice Docket No. 729; Adams Docket No. 474].

Plaintiffs' recoveries are subject to a 40% contingency fee in favor of the multiple law firms that represented them over the course of the litigation.  There is no dispute that the law firm of Markovits, Stock & DeMarco, LLC ("MSD") is entitled to 55% of the overall contingency fee.  The Court entered orders authorizing distribution of MSD's portion of the contingency fee on December 8, 2017.  See Order Approving Wrongful Death Distribution ("Trice Distribution Order") [Trice Docket No. 732]; Order Directing Distribution Attorneys' Fees Adams ("Adams Distribution Order") [Adams Docket No. 475].

A dispute remains over allocating the remaining 45% of the contingency fee, which totals $997,090.83 in the Trice case and $308,885.68 in the Adams case.  The disputed amounts are being held in the trust account of the Law Office of Kenneth R. White, P.C. ("White Firm") pending further Order of the Court.  See id.  The three firms vying for a share of the remaining fees are the Napoli Firm, which served as Plaintiffs' lead counsel from late 2012 to April 2014, and the Padden and White Firms, which have represented Plaintiffs since 2010.

Plaintiffs argue that the Napoli Firm is not entitled to any fees because the Plaintiffs terminated the Napoli Firm for cause and were harmed by the Napoli Firm's negligent prosecution of their case.  The Napoli Firm disagrees and argues that it performed significant work on the file and is entitled to recover its fees of $112,202.50 under the theory of quantum meruit.

Plaintiffs also argue that the remaining 45% of the contingency fee should be divided

3

among the Padden and White Firms by paying 30% to the White Firm and 15% to the Padden Firm. Plaintiffs contend that this allocation reflects the relative contributions of each firm to Plaintiffs' cases. The Padden Firm disagrees and argues that it is entitled to 30% of the contingency fee pursuant to the fee agreement that Plaintiffs signed in April 2014. The Padden Firm further argues that it is entitled to 40% of the recovery obtained by Robert Bolton, one of the next of kin in the Trice case. Robert Bolton disputes the Padden Firm's claim.

On January 16, 2018, United States Magistrate Judge David T. Schultz conducted a settlement conference on the disputed attorneys' fees, as well as the disputed claims to the judgment proceeds by medical providers. See Min. Entry [Trice Docket No. 835; Adams Docket No. 559]; Order Approving Stipulation [Trice Docket No. 769; Adams Docket No. 502]. Although settlement was reached on the medical providers' claims,[5] the attorneys' fee issues were not resolved. All counsel waived any hearing on the attorneys' fee issues and asked the Court resolve the dispute based on counsels' written submissions. See Letter District Judge [Trice Docket No. 765; Adams Docket No. 499].

**B. Relevant Factual Background**

Resolution of this dispute requires a review of the many attorney-client relationships in these cases.

---

[5] Trice agreed to settle medical liens of $1,566,066.82 in her case for a total of $892,658. See Order Approving Stipulation [Trice Docket No. 769; Adams Docket No. 502]. Adams agreed to settle a $29,231.70 medical lien in his case for $16,662. See id. The Court approved distribution of these amounts from the White Firm's trust account on January 22, 2018. See id. The balance of the medical expense proceeds remain in the White Firm's trust account.

### 1. Padden Law Firm LLC and Law Office of Kenneth R. White, P.C.

In 2010, Plaintiffs retained the Padden Firm to represent them in these companion cases. Pls.' Mem. Supp. Mot. Distribute [Trice Docket No. 718; Adams Docket No. 466] at 3; Padden Mem. Opp'n [Trice Docket No. 829] at 7. Shortly thereafter, the Padden Firm's principal, Michael B. Padden, Esq. ("Padden") requested and obtained the assistance of the White Firm to serve as additional counsel on the cases. Kenneth R. White, Esq. ("White") is a principal at the White Firm.

In addition to being retained by Adams and Trice in 2010, Padden also entered into a June 2010 Attorney-Client Consent Distribution Proposal ("Distribution Proposal") with Robert Bolton. Padden Letter Br. [Trice Docket No. 842] Ex. 1. In the Distribution Proposal, Robert Bolton: acknowledged paternity of Devyn Bolton; requested that Trice be approved as trustee for Trice's wrongful death claim on behalf of Devyn Bolton; agreed to receive 10% of any recovery obtained by Trice; stated that he had no obligation to pay attorneys' fees of 40% unless he received a recovery; and stated that Bridgette Trice consents to Padden's representation of him. Id. ¶¶ 3, 6–8. Padden has not communicated with Robert Bolton since this 2010 meeting. Bolton Letter Br. [Trice Docket No. 849] Ex. 1 ("Bolton Decl.") ¶ 3.

### 2. Waite, Schneider, Bayless and Chesley Co., LPA

In April 2010, Padden and White, with Trice and Adams' consent, chose the Ohio law firm of Waite, Schneider, Bayless and Chesley Co., LPA (the "Chesley Firm") to serve as primary litigation counsel in Trice and Adams' cases. See Markovits Reply Decl. Ex. 1 [Trice Docket No. 774; Adams Docket No. 507]; First Trice Decl. [Trice Docket No. 722; Adams Docket No. 468] ¶ 2. The Chesley Firm was chosen because White had previously worked with

the firm and knew that Stanley Chesley ("Chesley") served as counsel in multidistrict litigation alleging instances of sudden unintended acceleration in Toyota vehicles ("Toyota MDL").  First White Decl. [Trice Docket No. 723; Adams Docket No. 469] ¶ 2; Padden Decl. [Trice Docket No. 737] Ex. 8.

The Padden, White, and Chesley Firms entered into an April 8, 2010 letter agreement outlining the division of fees among the firms.  See Markovits Reply Decl. Ex. 1.  The Chesley Firm agreed to advance all ongoing expenses of the litigation.  Id.  On April 26, 2010, the agreement was amended to provide that the Chesley Firm would pay Padden $1,500 per month for "overhead expenses."  Markovits Reply Decl. Ex. 2 [Trice Docket No. 775; Adams Docket No. 508].  The amendment provides that if one of the cases should "result in payments of fees or costs, the total amount of these overhead payments up to that time will be deducted from [Padden's] share and paid to [the Chesley] firm."  Id.  Pursuant to this amendment, Padden received monthly payments totaling $34,500 from the Chesley Firm.  Markovits Reply Decl. [Trice Docket No. 772; Adams Docket No. 505] ¶ 25, Exs. 32, 33 [Trice Docket Nos. 805, 806; Adams Docket Nos. 538, 539].  In an August 2012 letter to Chesley, Padden acknowledged that "in the event of recovery, I am obligated to reimburse these funds to your firm."  Markovits Reply Decl. Ex. 3  [Trice Docket No. 776; Adams Docket No. 509].

Although a recovery has been obtained in these cases, Padden has not reimbursed the Chesley Firm for the $34,500 payments he received as "overhead expenses."

### 3.  Napoli Bern Ripka Shkolnik LLP

In July 2012, Chesley recommended that the Napoli Firm take over the Chesley Firm's role as primary litigation counsel.  First White Decl. ¶ 3; Padden Mem. Opp'n at 18.  Chesley

6

made the recommendation in light of his disbarment proceedings arising from conduct in an

unrelated case. First Farnolo Decl. [Trice Docket No. 745; Adams Docket No. 479] ¶¶ 3–4. The

Napoli Firm had also been counsel in the Toyota MDL. First White Decl. ¶ 3. The clients

consented to the change in lead counsel and the Napoli Firm began working on the cases in July

2012. Id. ¶ 3. The Chesley Firm withdrew from Plaintiffs' cases in June 2013. Id.

        After the Napoli Firm took over as lead counsel, the Court issued orders requiring

expert disclosures to be served in November 2012 and discovery to be completed by May 31,

2013. See Order Joint Mot. Extension Time Expert Disclosure [Trice Docket No. 249; Adams

Docket No. 136]; Fourth Am. Scheduling Order [Trice Docket No. 262; Adams Docket No.

139]. In November 2012, White sent an email to the Napoli firm stating, "I assume that we will

be designating experts in some manner in compliance with the court order." White Reply Decl.

[Trice Docket No. 808; Adams Docket No. 541] ¶ 6, Ex. 2 [Trice Docket No. 811; Adams

Docket No. 544]. On January 23, 2013, White received a courtesy copy of a letter sent by

Toyota to the Napoli Firm informing them that discovery responses were overdue and that

Plaintiffs had not served expert disclosures by the November 2012 deadline. First White Decl.

¶ 6, Ex. 5. White sent an email to the Napoli Firm referencing the letter and stating, "I trust that

you will get these issues corrected immediately to the extent that the letter is accurate." White

Reply Decl. Ex. 4 [Trice Docket No. 813; Adams Docket No. 546]. The Napoli Firm responded

by saying, "We responded to this already, they were looking for medicals on Devyn Bolton."

Coates Decl. [Trice Docket No. 754; Adams Docket No. 490] Ex. 3.

        In April 2014, White and Padden discovered that the Napoli Firm made an unauthorized

settlement demand to Toyota in February 2014 without Plaintiffs' knowledge or consent. First

White Decl. ¶ 4, Ex. 3.  Padden and White first learned of the settlement demand through an email they received from Toyota's counsel stating that settlement demands relayed by the Napoli Firm to Toyota were "too high to lead to productive negotiations."  First White Decl. Ex. 3.  The Napoli Firm had not consulted with Padden, White, or Plaintiffs before making the demand.  First White Decl. ¶ 5, Ex. 4.  Upon learning of the Napoli Firm's unauthorized settlement demand, Trice and Adams each sent the Napoli Firm an April 22, 2014 letter terminating their attorney-client relationship and demanding that the Napoli Firm withdraw from their cases immediately.  First White Decl. Ex. 4.

On July 23, 2014, three months after Plaintiffs had terminated the Napoli Firm, Padden sent a letter to the Napoli Firm asking that Plaintiffs' case files be forwarded to the Padden Firm.  First Markovits Decl. [Trice Docket No. 721; Adams Docket No. 467] Ex. 1 at 2.[6]  On August 4, 2014, the Napoli Firm responded that it would "draft a letter outlining any expenses incurred," and that "[u]pon payment of the expenses we will immediately make arrangements to transfer the file."  Id. at 5.  Plaintiffs' attorneys informed the Napoli Firm that the files were needed as quickly as possible because trial was scheduled for November 3, 2014, less than three months away.  Id. at 4.  Nevertheless, the Napoli Firm persisted in its position until Plaintiffs' counsel alerted the Napoli Firm to Minnesota Rule of Professional Conduct 1.16(g), which prohibits a lawyer from conditioning the return of client papers and property upon the payment of the lawyer's fees or the cost of copying the file.  First Markovits Decl. ¶ 3, Ex. 1 at 2–3, 7; First Farnolo Decl. ¶ 21.

---

[6] The page number references to this Exhibit are to the numbers in the top right corner of the page that have been assigned by the Court's electronic filing system.

After the files were returned, Plaintiffs learned that the Napoli Firm had failed to disclose approximately $500,000 of Devyn Bolton's $1.5 million in expenses before the close of discovery. First Markovits Decl. ¶ 5. This failure subsequently impacted the amount of medical expenses which was admissible evidence at trial, because of Toyota's successful argument that expenses be limited to the amounts disclosed in discovery. Id. As a result, Plaintiffs were limited to medical expenses of $1 million rather than $1.5 million. Id. Thus, there was an approximate $500,000 difference between the medical expenses incurred and those Trice was awarded on behalf of the next of kin. Id. The amount of pre-judgment interest Plaintiffs would have recovered on the additional $500,000 would also have been substantial based on the extended duration of the litigation. See id.

Plaintiffs also learned that the Napoli Firm failed to disclose any expert prior to the deadline set by the Court. Id. ¶ 6. Thus, Plaintiffs' only damages expert, Dr. Harvey Rosen, could not be used at trial even though he had prepared a report and had been deposed. Id. Plaintiffs paid Dr. Rosen's expert witness fees of $4,000 although he could not testify at trial because of discovery violations by counsel. Id. ¶ 6, Ex. 3.

### 4. Markovits, Stock & DeMarco, LLC

Following termination of the Napoli Firm, Plaintiffs retained MSD to assume the role of lead counsel. Two of MSD's principals, Markovits and Stock, were former associates of the Chesley Firm and had worked on Plaintiffs' cases when they were employed at the Chesley Firm. Markovits Reply Decl. Ex. 3 [Trice Docket No. 776; Adams Docket No. 509] .

In April 2014, Plaintiffs signed a retention agreement with MSD that (a) reaffirmed the 40% contingency fee structure that had been in place since the case began; (b) directed MSD to

serve as lead litigation counsel should the case go to trial; and (c) provided for an allocation of the contingent fee as follows: 55% to MSD, 30% to the Padden Firm, and 15% to the White Firm. First Padden Decl. Ex. 12; First Markovits Decl. ¶ 8; First Trice Decl. ¶ 7.

Plaintiffs' case was tried to a jury beginning January 7, 2015, and the jury reached a verdict on February 3, 2015. White was involved in the trial preparations and attended the trial; Padden did not. First Markovits Decl. ¶¶ 11–12; First Trice Decl. ¶ 10.

On February 12, 2015, Plaintiffs modified the April 2014 fee agreement by: 1) specifying that MSD was to act as sole lead counsel going forward; 2) authorizing MSD to hire additional counsel provided that Plaintiffs' 40% contingency fee would not be increased; and 3) authorizing MSD to make equitable adjustments to the fees of MSD, the White Firm, and the Padden Firm to account for work performed post-trial and on appeal. First Markovits Decl. Ex. 4.

### 5. Robins Kaplan LLP

Following the jury verdict for Plaintiffs, Toyota appealed and Plaintiffs cross-appealed. With Plaintiffs' consent, MSD hired Robins Kaplan LLP ("Robins") as appellate counsel. Markovits Reply Decl. ¶ 17. The appeal included plaintiffs from other companion cases who also benefitted from Robins' representation. Id. ¶ 18. MSD entered into a $300,000 contingency fee with Robins that would not increase the 40% fee to Plaintiffs but would decrease in part the fee paid to MSD. Id. ¶ 17. MSD paid Robins $219,900 on behalf of Trice and Adams. Id. ¶ 18. The remaining amount owed to Robins was paid by the plaintiffs in the companion cases. Id. MSD seeks proportionate reimbursement from White and Padden for their share of Robins' fees paid by MSD. Id.

## C.  Present Motion

The remaining 45% of the contingency fee, as well as 40% of next of kin Robert Bolton's distribution, are being held in the White Firm's trust account pending resolution of the following issues:  (1) whether the Napoli law firm is entitled to a quantum meruit recovery for the services to Plaintiffs; (2) the proper allocation of attorneys' fees between the Padden and White Firms; (3) whether Padden must reimburse the Chesley Firm for the $34,500 advance he received from the firm; (4) whether Padden may recover a 40% contingency fee from Robert Bolton; and (5) whether the Padden and White Firms must reimburse MSD for their proportional share of Robins' fees.

## III.  DISCUSSION

## A.  Jurisdiction

As an initial matter, this Court has jurisdiction over the present disputes regarding allocation of attorneys' fees.  A federal court's ancillary jurisdiction gives it authority to resolve attorneys' fee disputes related to the underlying litigation over which it has jurisdiction.  Iowa v. Union Asphalt & Roadoils, Inc., 409 F.2d 1239, 1243 (8th Cir. 1969) (holding that federal court had ancillary jurisdiction over attorneys' fee dispute because "a district court acquires jurisdiction of a case or controversy as an entirety, and hence may, as an incident to disposition of a matter properly before it, possess jurisdiction to decide other matters raised by the case of which it could not take cognizance were they independently presented") (citation omitted); Fed. Sav. & Loan Ins. Corp. v. Ferrante, 364 F.3d 1037, 1041 (9th Cir. 2004) ("[A]ncillary jurisdiction exists over attorney fee disputes collateral to the underlying litigation.") (citing Union Asphalt, 409 F.3d at 1243–44).

Plaintiffs' Motion asks the Court to allocate the fees owed to attorneys as compensation for the work they performed in these cases. Therefore, the Motion is related to the underlying actions, and the exercise of ancillary jurisdiction is proper.

## B. Napoli Firm

Plaintiffs argue that the Napoli Firm forfeited its right to any fees because it failed to meet its obligations to Plaintiffs, including the duty to disclose the following material matters: (1) the unauthorized settlement offer; (2) the failure to timely produce discovery; and (3) the failure to timely disclose Plaintiffs' expert. Plaintiffs contend that the Napoli Firm's failure to meet its obligations involved bad faith and caused Plaintiffs quantifiable harm. Plaintiffs further argue that the Napoli Firm is not entitled to quantum meruit recovery because it has failed to prove the reasonable value of its services.

The Napoli Firm responds that it is entitled to quantum meruit recovery of $112,202 for the value of the work it performed in these cases. As documentation for this claim, the Napoli Firm has filed a two-page "recreated" spreadsheet ("Billing Summary") purporting to detail the time and services for which compensation is requested. See Second Farnolo Decl. Ex. B [Trice Docket No. 840; Adams Docket No. 564].[7] The Napoli Firm argues that fee forfeiture is not warranted because the firm did not act fraudulently or in bad faith when it failed to advise

_____

[7] The Billing Summary was filed under seal on January 26, 2018, after a full round of briefing on the Napoli Firm's quantum meruit claim had been completed. The Napoli Firm contends the filing was timely and proper under this Court's January 17, 2018 letter [Trice Docket No. 765; Adams Docket No. 499], which permitted all counsel to file a 3-page supplemental letter identifying the issues that remained in dispute following the settlement conference with Judge Schultz. Plaintiffs filed a Motion to Strike [Trice Docket No. 850; Adams Docket No. 570], arguing that the Napoli Firm's January 26 submissions exceed the scope permitted by the Court. The Motion to Strike is denied, and the Napoli Firm's January 26, 2018 Motion to Seal is granted.

12

Plaintiffs of the unauthorized settlement demand, or to timely file discovery responses and expert disclosures. The Napoli Firm additionally argues that Plaintiffs were not harmed by this conduct.

Quantum meruit is an equitable doctrine which allows recovery when a party benefits from another's services and it would be unjust for the party to retain the benefit without paying. Ylijarvi v. Brockphaler, 7 N.W.2d 314, 319 (Minn. 1942); Alderson v. Homolka, No. A06-395, 2007 WL 968740, *5 (Apr. 3, 2007). The proper amount of a quantum meruit claim for attorney's fees is "the reasonable value of the lawyer's services." See Ruzicka v. Rothenberg, 83 F.3d 1033, 1034 (8th Cir. 1996). Relevant factors for determining the reasonable value of legal services include: "the time and labor required; the nature and difficulty of the responsibility assumed; the amount involved and the results obtained; the fees customarily charged for similar legal services; the experience, reputation, and ability of counsel; and the fee arrangement existing between counsel and the client." State by Head v. Paulson, 188 N.W.2d 424, 426 (1971); see also Minn. R. Prof. Conduct 1.5(a) (listing similar factors).

Here, the Napoli Firm is not entitled to recover under the quantum meruit doctrine because the Plaintiffs did not benefit from its services. Rather, the Napoli Firm's representation harmed Plaintiffs due to the Napoli Firm's failure to meet critical discovery and expert disclosure deadlines. These failures prevented Plaintiffs from introducing $500,000 in medical expenses at trial and from calling their sole damages expert to testify. Plaintiffs were precluded from recovering the additional $500,000 in medical expenses plus significant pre-judgment interest on this additional amount as a result of the Napoli Firm's failures.

The Napoli Firm attempts to spread the blame for failing to meet the disclosure deadlines

by arguing that the other firms involved in these cases also failed to make these disclosures. But the responsibility for timely making the disclosures fell squarely on the Napoli Firm as lead counsel. Moreover, counsel from the other firms contacted the Napoli Firm to confirm that the deadlines were being timely met, and the Napoli Firm assured them that they were.

The Napoli Firm also insists that the harm is merely speculative because Toyota might not have stipulated to the additional $500,000 in medical expenses even if the medical records had been produced. However, Toyota stipulated to the $1 million in medical expenses timely disclosed in discovery, and the Napoli Firm offers no argument or evidence for why Toyota would not have similarly stipulated to the additional $500,000 in expenses had they been properly disclosed. Additionally, to the extent there is doubt that Toyota would have agreed to stipulate to the additional $500,000 in medical expenses, the doubt is created by the Napoli Firm's shortcomings.

Plaintiffs were also harmed by the Napoli Firm's unauthorized settlement demand, which caused Toyota to cease settlement negotiations. The settlement demand violated Minnesota Rule of Professional Conduct 1.2(a), which states that "[a] lawyer shall abide by a client's decision whether to settle a matter." Additionally, the Napoli Firm's failure to inform Plaintiffs that a settlement demand had been made and rejected violated Minnesota Rule of Professional Conduct 1.4(a), which imposes a duty on a lawyer to "promptly inform the client of any decision or circumstance with respect to which the client's informed consent . . . is required by these rules." Moreover, after Plaintiffs terminated the Napoli Firm for cause for violating these ethical rules, it compounded the misconduct when it held Plaintiffs' file hostage by conditioning the return of the file on reimbursement for its expenses. The Napoli Firm only returned the file when it was

14

informed about a Minnesota Rule of Professional Conduct specifically prohibiting such behavior. When the file was returned, trial was only a few months away. The net effect of the Napoli Firm's representation caused Plaintiffs more harm than good. Because the Napoli Firm's work on the case did not benefit Plaintiffs, the equitable doctrine of quantum meruit does not require that the Napoli Firm be compensated for its services.

Even if the Napoli Firm had provided some overall value (which it did not), the firm has not established that its requested fees are reasonable. The Napoli Firm has offered no evidence to demonstrate that the hourly rates charged by counsel—$500 for an associate attorney, $600 for a senior associate, and $800 for a senior partner—are consistent with those customarily charged for similar legal services. See Bailey v. Runyon, 50 F. Supp. 2d 891, 894 (D. Minn. 1999) (holding that an appropriate fee could not be determined where counsel did not provide information as to how the hourly rate was set nor inform the court of the hourly rate charged by other attorneys with similar experience). Nor has the Napoli Firm provided evidence of the experience, reputation, and ability of the attorneys who worked on Plaintiffs' cases.

The record also shows that the Napoli Firm is seeking reimbursement for attorney time relating to Plaintiffs' expert, Dr. Rosen, even though the expert was never disclosed and thus could not be used at trial. See Billing Summary at 1. Similarly, the Napoli Firm charged $950 for the time spent making the unauthorized settlement offer to Toyota. Id. at 2–3. Moreover, an associate with a rate of $500 per hour spent 3.1 hours "drafting" two pro hac vice motions. Billing Summary at 1. This is excessive given the motions were prepared from a two-page form provided on the district court's website that merely required the associate to insert routine information such as case name and number, and attorney name, license number, and contact

information.  See Mots. Pro Hac Vice [Trice Docket Nos. 264, 265].  Adding to this excessiveness, a senior partner charging $800 per hour spent more than half an hour reviewing and approving the two form-based pro hac vice motions.  Billing Summary at 2.  The fee request also seeks compensation for 6.1 hours charged by a senior associate to attend a deposition that lasted only 3.7 hours.  See id. at 1; Markovits Reply Decl. ¶ 18, Ex. 4.  Additionally, the Napoli Firm requests compensation for a senior associate charging $600 per hour to perform clerical tasks such as uploading documents onto the court's electronic filing system.  See Billing Summary at 2.

Because Plaintiffs did not benefit from the Napoli Firm's services and the Napoli Firm has not proven the reasonable value of its services, the Napoli Firm is not entitled to recover under the equitable doctrine of quantum meruit.

## C.  Padden Firm and White Firm Fee Allocation

Plaintiffs ask the Court to allocate 15% of the attorneys' fees to the Padden Firm and 30% to the White Firm to reflect the proportionate amount of their work on these cases. Plaintiffs argue that this proposed allocation is equitable based upon Padden's minimal involvement in their cases and White's significant input and contributions.  Padden opposes the request, arguing that the April 2014 Retainer Agreement entitles him to 30% of the attorneys' fees.

The Minnesota Supreme Court has repeatedly recognized that the attorney-client relationship differs from other contractual relationships, and thus different legal principals are applied when interpreting and enforcing attorney-fee agreements.  In re Distrib. of Attorney's Fees between Stowman Law Firm, P.A. & Lori Peterson Law Firm, 870 N.W.2d 755, 760

16

(Minn. 2015); Krippner v. Matz, 287 N.W. 19, 24 (Minn. 1939). "Because the attorney-client relationship, even if memorialized in a written agreement, is subject to ethical and professional rules promulgated by the court, ordinary contract principles must yield at times to these paramount standards." Stowman, 870 N.W.2d at 760.

The standards for dividing fees among lawyers in different firms are set forth in Minnesota Rule of Professional Conduct 1.5(e), which provides:

> A division of a fee between lawyers who are not in the same firm may be made only if:
>
> (1) the division is in proportion to the services performed by each lawyer or each lawyer assumes joint responsibility for the representation;
>
> (2) the client agrees to the arrangement, including the share each lawyer will receive, and the agreement is confirmed in writing; and
>
> (3) the total fee is reasonable.

Applying these standards to Trice and Adams' cases, the Court concludes that Plaintiffs' proposed fee allocation of 15% to the Padden Firm and 30% to the White Firm is appropriate.

With respect to the proportionality of the fee division, as required in subdivision (1) of Rule 1.5(e), the submissions by Plaintiffs—as well as this Court's observations over the many years of this litigation—establish that Padden has been minimally involved in the substantive work on these cases, whereas White has expended substantial time and effort. Padden only nominally participated in the pre-trial litigation motion practice or strategy, did not participate in preparing the case for trial, did not participate in or attend the trial, did not contact Plaintiffs during trial, did not participate in the post-trial and appellate stages of the cases, did not work with Plaintiffs to finalize the distribution statements, and did not contribute to the financing of

this case.  First Markovits Decl. ¶¶ 11–12; First Trice Decl. ¶ 10.  In contrast, White provided extensive input and expertise regarding Minnesota law and procedure, assisted MSD in getting up to speed after the Napoli Firm was terminated, and was significantly involved in motions in limine, jury instructions, legal issues arising at trial, post-trial issues, and appellate support. Markovits Reply Decl. ¶ 7; White Reply Decl. ¶¶ 10–11, 13, 15.  Thus, the fee division in the April 2014 Retainer Agreement must yield to a more fair reflection of the work actually performed, which is 15% to the Padden Firm and 30% to the White Firm.

Regarding the client's agreement to the fee division, as required under subdivision (2) of Rule 1.5(e), Trice and Adams both oppose a fee division of 30% for the Padden Firm and 15% for the White Firm.  Trice Reply Decl. ¶ 10 [Trice Docket No. 755; Adams Docket No. 491]; Adams Decl. [Trice Docket No. 756; Adams Docket No. 492] ¶ 5.  Both clients agree that switching these figures so that the Padden Firm receives 15% and the White Firm 30% better reflects the amount of work that each attorney performed.  Trice Reply Decl. ¶¶ 8–9; Adams Decl. ¶ 4.

Padden raises several unpersuasive arguments against Plaintiffs' proposed distribution. First, Padden contends that he contributed a substantial amount of time in 2010 orchestrating television, newspaper, and other media coverage to convince the public that the cause of the 2006 accident was a product defect in the Toyota Camry.[8]  Padden argues that this media coverage provided a springboard to Trice and Adams' cases in this Court.  The Court disagrees. These cases were tried in federal district court, not the court of public opinion.  Padden's

---

[8] A cynic might conclude that Padden's involvement with the media was motivated by his desire to enhance his reputation as a "high profile" lawyer as much as to educate the public for the benefit of his clients.

substantive involvement in this forum paled in comparison to White's.

Padden also argues that he significantly contributed to the cases in 2010 by hiring a local mechanic to inspect the Toyota vehicle involved in the collision. The mechanic noticed filament damage in the car's left rear brake lamp, which indicated to the mechanic that the brake lamp was energized at the time of impact. Padden Mem. Opp'n at 14. Although Padden deserves credit for hiring a competent mechanic, this was not major, substantive legal work.

Padden also speculates that Plaintiffs' proposed allocation is motivated by Trice's personal animosity toward him. However, both Plaintiffs have submitted declarations stating that their proposed allocation is based on their observations that White did substantially more work in their cases than Padden. Plaintiffs' observations are consistent with the Court's observation of White and Padden's roles in litigating the case.

### D. Payments from Chesley Firm to Padden Firm

The record also establishes that the Padden Firm is not entitled to keep the $34,500 in overhead payments received from the Chesley Firm. Indeed, Padden admitted as much in his August 2012 letter to Chesley stating that "in the event of recovery, I am obligated to reimburse these funds to your firm." Markovits Reply Decl. Ex. 3. Thus, the Padden Firm's 15% portion of the contingency fee will be reduced by the $34,500 owed to the Chesley Firm.

In resisting this conclusion, Padden argues that the Chesley Firm is the only party with standing to advocate for the Padden Firm's repayment of the funds. Not so. Plaintiffs have an interest in ensuring that the Chesley Firm's expenses in these cases are properly repaid from the judgment proceeds and not sought from them.

Padden also argues that he is entitled to keep the $34,500 because he would not have

19

agreed to bring the Chesley Firm on board in this litigation had he known of the difficulties at the firm. This distorted logic fails because had Padden not agreed to add the Chesley Firm to Plaintiffs' legal team, he would not have received $34,500 in payments from the firm. The Padden Firm's 15% contingency fee shall be reduced by $34,500 to account for the amount owed to the Chesley Firm.

## E.  Robins' Fees

MSD requests reimbursement from the White and Padden Firms for their proportionate share of Robins' fees. White agrees that MSD is entitled to proportionate reimbursement; Padden does not.

The engagement of Robins benefitted Plaintiffs and, derivatively, Padden and White. Had Plaintiffs' verdict been vacated on appeal, their attorneys would not have been entitled to a contingency fee. Additionally, no party has objected to the reasonableness of Robins' $300,000 contingency fee. Based on these circumstances, requiring the Padden and White Firms to pay their proportionate share of Robins' fees is equitable and justified.

## F.  Robert Bolton

Padden claims that he alone is entitled to the full 40% contingency fee from next of kin Robert Bolton's share of the judgment in the Trice case. In support, Padden cites to the Distribution Proposal—signed by Robert Bolton, Trice, and Padden—which states that Trice consents to Padden's representation of Robert Bolton.

For at least two reasons, Padden is not entitled to recover the full 40% contingency fee from Robert Bolton's share of the judgment. First, Padden's attempt to represent both Trice and Robert Bolton in this case violates Minnesota Rule of Professional Conduct 1.7, which

"prohibits representation of opposing parties in the same litigation, regardless of the client's consent." Minn. R. Prof. Conduct 1.7, cmt. 23. Because Trice, in her capacity as trustee, brought her case on behalf of all of Devyn Bolton's next-of-kin, Padden's effort to also represent Robert Bolton individually results in conflicting representation. This is because any recovery by Robert Bolton from the wrongful death proceeds diminishes the pool of funds from which the rest of the next-of-kin must share. Thus, Padden is prohibited from representing Trice and Robert Bolton in the same litigation, regardless of client consent. Padden is not entitled to fees beyond his proportionate share of the contingency fee earned in the case brought by Trice on behalf of all next-of-kin.

Second, the $110,869 fee that Padden is attempting to recover for his representation of Robert Bolton is unreasonable. Under Minnesota Rule of Professional Conduct 1.5(a), "[a] lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses." As previously discussed, factors considered in determining the reasonableness of a fee include the time and labor required, the novelty and difficulty of the questions involved, the amount involved and results obtained, and the nature and length of the professional relationship. Minn. R. Prof. Conduct 1.5(a); State by Head, 188 N.W.2d at 426.

Here, Padden did no work to justify his fee. He met with Robert Bolton only once in 2010 and has not communicated with him since. Padden also advocated for an amount for Robert Bolton that was far below the amount actually recovered, and never appeared at the hearing on the next of kin distribution.[9] Thus, Padden is not entitled to the entire contingency

---

[9] On November 1, 2017, in anticipation of the distribution of the Trice judgment proceeds to the next of kin, Padden told other counsel in this case that Robert Bolton would likely be willing to accept $10,000 in settlement of his claim. White Reply Decl. ¶ 27, Ex. 10 [Trice

fee attributable to Robert Bolton's award.  Rather, Padden's attorneys' fees are limited to 15% of

the Trice contingency fee, minus the amounts he owes to the Chesley Firm and to Robins.

Additionally, under no circumstance may Padden recover a second or separate round of

attorney's fees from Robert Bolton.

### IV.  CONCLUSION

Based upon the foregoing, and all of the files, records and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.    The disputed medical liens totaling $1,566,066.82 in the Bridgette Trice case were settled
      for $892,658.00, and the balance of $673,408.82 shall be distributed as follows:

      a.

      b.

      c.

      d.

      e.

      f.

2.    The disputed attorneys' fees totaling $997,090.83 in the Bridgette Trice case shall be
      distributed as follows:

      a.    The claim for fees by Napoli, Bern, Ripka & Shkolnik, LLP is denied.

      b.    The Padden Law Firm, PLLC shall receive $281,749.86.  This amount represents
            15% of the Trice contingency fee ($2,215,757.40 Trice contingency fee x 15% =
            $332,363.61); minus the Padden Firm's proportionate share (15%) of the Robins
            fees allocated to Trice ($164,925 Robins fees allocated to Trice x 15% =

---

Docket No. 819].  Padden did not attend the distribution hearing held by the Court.  On
December 8, 2017, the Court awarded Robert Bolton $80,279.99.  See Order [Trice Docket No.
731].

$24,738.75), which shall be distributed to MSD; and minus the "Trice-allocated" fees advanced by the Chesley Firm to the Padden Firm, which total $25,875 and shall be distributed to the Chesley Firm.

c.      The Law Office of Kenneth R. White, P.C. shall receive $615,249.72. This amount represents 30% of the Trice contingency fee ($2,215,757.40 Trice contingency fee x 30% = $664,727.22); minus the White Firm's proportionate share (30%) of the Robins fees allocated to Trice ($164,925 Robins fees allocated to Trice x 30% = $49,477.50), which shall be distributed to MSD.

3.      The $32,112.00 withheld from distribution to Robert Bolton by the Law Office of Kenneth R. White shall now be distributed to Robert Bolton.

4.      The disputed medical liens totaling $29,231.70 in the Quincy Ray Adams case were settled for $16,662.00, and the balance of $12,569.70 shall be distributed to Quincy Ray Adams.

5.      The disputed attorneys' fees totaling $308,885.68 in the Quincy Ray Adams case shall be distributed as follows:

a.      The claim for fees by Napoli, Bern, Ripka & Shkolnik, LLP is denied.

b.      The Padden Law Firm, PLLC shall receive $86,090.64. This amount represents 15% of the Adams contingency fee ($686,412.63 Adams contingency fee x 15% = $102,961.89); minus the Padden Firm's proportionate share (15%) of the Robins fees allocated to Adams ($54,975 Robins fees allocated to Adams x 15% = $8,246.25), which shall be distributed to MSD; and minus the "Adams-allocated" fees advanced to the Padden Firm by the Chesley Firm, which total $8,625 and shall be distributed to the Chesley Firm.

c.      The Law Office of Kenneth R. White, P.C. shall receive $189,431.29. This amount represents 30% of the Adams contingency fee ($686,412.63 Adams contingency fee x 30% = $205,923.79); minus the White Firm's proportionate share (30%) of the Robins fees allocated to Adams ($54,975 Robins fees allocated to Adams x 30% = $16,492.50), which shall be distributed to MSD.

6.      Trice's Motion to Strike [Trice Docket No. 850; Adams Docket No. 570] is **DENIED**; and

7.      The Napoli Firm's Motion to Seal [Trice Docket No. 843; Adams Docket No. 566] is **GRANTED**.

   **LET JUDGMENT BE ENTERED ACCORDINGLY.**

                                        BY THE COURT:


                                        _____s/Ann D. Montgomery_____
                                        ANN D. MONTGOMERY
                                        U.S. DISTRICT JUDGE

Dated:  April 27, 2018.